**Patrick J. CONWAY, et ux., Plaintiffs and Counterclaim Defendants,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. MJG–93–1707.**

United States District Court, D. Maryland.

Aug. 10, 1995.

Edward L. Blanton, Jr., Baltimore, MD, for plaintiffs.

Michael J. Salem, Trial Attorney, Tax Div., U.S. Dept. of Justice, Washington, DC, Ed-

## MEMORANDUM AND ORDER

GARBIS, District Judge.

The Court has before it the United States' Motion for Summary Judgment, United States' [Second] Motion for Summary Judgment, Plaintiffs' Motion for Summary Judgment and the materials submitted by the parties relating thereto. The Court has held a hearing and had the benefit of the arguments of counsel.

The Court recognizes that Mr. and Mrs. Conway ("the Taxpayers") acted in good faith and without intent to evade their tax responsibilities. Nevertheless, the Court concludes that, in view of the undisputed facts and the pertinent provisions of the Internal Revenue Code, it must hold for the Government.

The Court notes that the Taxpayers have the right to appeal this Court's decision to the United States Court of Appeals for the Fourth Circuit. They should certainly consider exercising this right if they believe there is any chance to persuade the appellate court to reach a different result. In any event, Mr. and Mrs. Conway (together with all of the other taxpayers similarly situated) should consider seeking a legislative solution in light of their unique, and personally compelling, circumstances.

## I. BACKGROUND

### A. Facts

This case involves changes made in the structure of the Maryland State pension systems. In 1927, the State of Maryland created a fund to provide retirement benefits for teachers of the State who were participants in the Maryland Retirement System (the "Old Retirement System"). Maryland created a similar fund in 1941 to provide retirement benefits for all State employees who were participants in the Old Retirement System.[1] The Retirement Systems required mandatory non-deductible contributions from

---

1. The two systems, collectively, are referred to as the "Retirement Systems."

294

all participants. The Retirement Systems were "qualified defined benefit plans" within the meaning of § 401(a)[2] (1982, 1988), and the trusts maintained as a part of the Retirement Systems were tax exempt under § 501(a) (1982, 1988).

In the late 1970's, actuarial projections indicated that the Retirement Systems were dangerously underfunded. In response to those findings, the State closed eligibility for participation in the Retirement Systems as of January 1, 1980, and developed the Maryland Employees' Pension System and the Maryland Teachers' Pension System (the "Pension Systems") to provide retirement benefits for State employees and teachers hired after that date. The Pension Systems required mandatory nondeductible contributions only from those participants with salaries greater than the taxable wage base set for Social Security benefits. The Pension Systems were "qualified defined benefit plans" within the meaning of § 401(a), and the trusts maintained by the Pension Systems were tax exempt trusts under § 501(a).

After the creation of the Pension Systems and the passage of further pension reform legislation in 1984, members of the Retirement Systems had four options. A member could elect to:

1. Pay an additional two percent of salary and retain unlimited cost of living adjustments on his or her benefits at the time of retirement,

2. Freeze his or her rate of contribution at the then-current level and retain the same benefit formula; however, any future cost of living adjustment would be limited to a maximum of a five percent increase in any one year,

3. Participate in a hybrid plan whereby he or she would receive benefits based on the Retirement System formula to the extent of retirement credit earned up to July 1, 1984, and benefits based on the Pension System formula for credit earned after that date, or

4. Transfer into the new Pension System. See Md. State Teachers' Ass'n v. Hughes, 594 F.Supp. 1353 (D.Md.1984) (providing detailed description of Maryland pension reform).

Plaintiff Patrick J. Conway was a Maryland teacher who chose the fourth option and transferred from the Retirement System to the Maryland Teacher's Pension System in 1990. There is no doubt that Mr. Conway selected this option with the good faith belief that the transfer would not have tax consequences. Upon the transfer, Mr. Conway received a refund of certain contributions paid by him to the Retirement System (the "Transfer Refund").[3] Mr. Conway's service credits, salary level, and other informational data were transferred into his new Pension System account. At the time of distribution, Mr. Conway was less than 59.5 years of age, was not disabled, and had not separated from service as a teacher. Upon receiving his Transfer Refund, Mr. Conway deposited the sum in an Individual Retirement Account ("IRA").

**B. Procedure**

The Taxpayers filed a joint federal income tax return for 1990. On this return, they disclosed the previously untaxed portion of the distribution from the Maryland Retirement System ($59,230.00), but indicated that the taxable amount of this distribution was $0.00. On the Disclosure Statement attached to the return, Mr. Conway stated:

The amt [sic] that was taxable $59,230 was rolled over to an IRA trusted by First Trust Corp Acct # F12345 and is not included on Line 1040 16A or 16B.

There is no doubt that the Taxpayers took their tax return position in good faith. Nevertheless, the Internal Revenue Service ("IRS") took a different view, and eventually decided to include the previously untaxed portion of the Transfer Refund in the Taxpayers' taxable income. On September 28, 1992, the Taxpayers, in order to meet the jurisdictional prerequisites for their law suit,

2. All statutory references herein are to the Internal Revenue Code, 26 U.S.C. unless otherwise indicated.

3. Mr. Conway received a total distribution of $80,465.32, representing $21,235.00 of previously taxed contributions, and untaxed earnings of $59,230.32.

signed a Form 870[4] permitting the assessment—without notice of deficiency—of deficiencies in income tax, the § 72(t)(1) addition to tax, and the § 4973(a) excise tax on excess contribution to an IRA.

On November 24, 1992, the Taxpayers paid the assessments in full[5], with interest, and timely[6] filed claims for refund. On February 8, 1993, due to a processing error, the IRS refunded the claimed excise tax plus interest.

On June 11, 1993, more than six months after filing their claims for refund of income tax, addition to tax and interest and without IRS action on the claims, the Taxpayers timely[7] filed their law suit. On September 7, 1993, the Government timely[8] filed its Counterclaim seeking a recovery of an erroneous refund of the excise tax plus interest.[9]

In sum, the Court has jurisdiction over the Taxpayers' Complaint and the Government's Counterclaim.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate in those cases in which there is no genuine dispute as to a material fact, and the movant is entitled to judgment as a matter of law. See Rule 56(c), Fed.R.Civ.P.

In this case there is no dispute as to the actions taken by all concerned. The only issues relate to the legal effect of these actions. Accordingly, there is no genuine issue

of material fact and a disposition upon a motion for summary judgment is appropriate.

## III. DISCUSSION

■ As a general rule, distributions from qualified retirement plans are taxable as ordinary income in the year of distribution. See § 402(a) (1988)[10]; *Edwards v. Commissioner*, 906 F.2d 114, 115 (4th Cir.1990). A distribution may be entitled to favorable tax treatment, however, if it qualifies as a "partial distribution" *and* (1) falls within certain "Special Rules"; or (2) qualifies as a "qualified total distribution." See § 402(a)(5).

### A. There Was a "Partial Distribution"

■ A "partial distribution" is defined by the Internal Revenue Code (the "Code") as "any distribution to an employee of *all or any portion* of the balance to the credit of such employee in a qualified trust; except that such term shall not include any distribution which is a qualified total distribution." § 402(E)(v) (emphasis added).

The Taxpayers argue that the distribution could not have been partial because Mr. Conway received the *entire* balance to the credit of his account in the Retirement System qualified trust when he transferred to the Pension System, and what is an *entire* distri-

**4.** By signing a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, the Taxpayers consented to immediate assessment and collection of the deficiencies shown thereon, without waiving their right to pay the tax and file a claim for refund.

**5.** The assessment included a minor amount related to adjustments that are not at issue in this case. The I.R.S. formally disallowed the claim on July 9, 1993, after suit was filed.

**6.** The claims were filed well within 3 years from the date the return was filed *and* within 2 years of the payments sought to be refunded.

**7.** Id.

**8.** § 6532(b).

**9.** See West's Federal Forms, National Courts, Ch. 189 (Bergner), § 13497 at 401 (1995).

**10.** Section 402 (1988) was amended with respect to distributions made after December 31, 1992. See Unemployment Compensation Amendments of 1992, Publ.L. 102–318, 106 Stat. 300, § 521. All references to § 402 in this decision are to the version enacted in 1986 and in effect for distributions made on, or before, January 1, 1993.

According to § 402(a), as enacted in 1986 and in effect in 1990, the year of Plaintiff's distribution:

The amount actually distributed to any distributee by an employees' trust described in Section 401(a) which is exempt from tax under Section 501(a) shall be taxable to him, in the year in which so distributed, under section 72 (relating to annuities).

At all relevant times, the employees' trust maintained by the Retirement System fell within the description of § 401(a) and was exempt from tax under § 501(a).

bution cannot logically be a *partial* distribution. This argument is unavailing because:

1. There was not a distribution of all of Mr. Conway's pension rights, and

2. Even if there was, the Code specifies that a distribution of "all" pension rights is, nonetheless, a "partial" distribution for tax purposes unless it constituted a "qualified total distribution."

According to state law, when a Retirement System member transfers between the Retirement System and the Pension System, any contributions not eligible for refund are transferred into that member's new Pension System account, along with his or her service credits, salary level, and relevant past information accumulated by the Retirement Agency. *See* Md.Code Annot. art. 73B § 32. In this case, although the Taxpayers may have received the full monetary amount credited to Mr. Conway's account with the Retirement System, his service credits, salary levels, and informational data were transferred to his new Pension System account. Although intangibles such as service credits and salary level may not have a definite or immediately discernible pecuniary worth, they nonetheless represent real value in the calculation of future Pension System benefits. Therefore, the monetary distribution to Mr. Conway did not constitute the "entire" balance to the credit of his account.

Even if there had been a distribution of the entire balance of Mr. Conway's account, it was still a "partial distribution" for tax purposes. The Code specifies that a "partial distribution" includes *"all* or any portion of the balance to the credit of such employee in a qualified trust." (Emphasis added). Therefore, even if the Taxpayers did receive a refund of "all" of the balance to the credit of Mr. Conway's account in the Retirement System, this would still constitute a "partial distribution," unless the refund fell within the statutory definition of a "qualified total distribution."

## B. The "Special Rules" Permitting Rollover Treatment Are Not Applicable

■■■ A "partial distribution" may qualify for "rollover," or tax favorable, treatment if it is transferred to an eligible retirement plan *and* meets certain "Special Rules." Basically, a partial distribution is entitled to rollover treatment *only if:*

1. It was made on account of the employee's death, separation from service, or disability, and is of an amount equal to at least 50 percent of the balance to the credit of the employee in a qualified trust; *and*

2. It was not one of a series of periodic payments, *and*

3. The employee elects to have such treatment apply.

Each of these three requirements must be met.

In this case, the Taxpayers fail to clear the first hurdle. The distribution was *not made* on account of Mr. Conway's death, separation from service, or disability.[11] Consequently, the distribution at issue did not qualify for rollover treatment and was taxable income in 1990. The Taxpayers are, thus, not entitled to their claimed income tax refund.

## C. There Was No "Qualified Total Distribution"

### 1. Section 402

■■ The Code defines the term "qualified total distribution" as including "1 or more distributions—

(I) within 1 taxable year of the employee *on account of a termination of the plan* of which the trust is a part . . . (Emphasis added).

§ 402(a)(5)(E)(i)(I) (1988).[12]

The Taxpayers argue that the distribution to Mr. Conway was made *on account of the*

---

**11.** The Government also has alleged that Taxpayers did not elect to have § 402(a)(5)(A) apply, the third requirement for rollover treatment. *See* United States' [Second] Motion for Summary Judgment at 20 n. 13. Because the distribution did not meet the first requirement, however, it is unnecessary to determine whether Taxpayers failed to make a required election.

**12.** The Taxpayers have not contended that the distribution met the "lump sum" requirements of § 402(a)(5) (E)(I)(II), or that it was a "distribu-

*Retirement System plan's termination* in either 1979 (when the State closed eligibility for participation in the Retirement System for employees hired after January 1, 1980) or 1984 (when the State altered the Retirement System benefit formula). In essence, the Taxpayers argue that while the Plan *trust* may have continued in existence after 1979 and 1984, the Plan itself was not ongoing. Instead, the Taxpayers assert, the Plan was effectively closed and assumed a finite lifespan after January 1, 1980, so that when the last existing member received his or her benefits, the Plan would cease to exist. The Court cannot agree.

The Plan was neither liquidated nor distributed in 1979 or 1984. Nor has it been as of this writing. Significantly, while Taxpayers contend that the Plan terminated in either 1979 or 1984, they did not receive their distributions until 1990, when they voluntarily elected to transfer from the Retirement System to the Pension System. Moreover, the Government notes that in both 1979 and 1984, all existing Plan members, including Mr. Conway, were given the option to remain within the Retirement System.

In sum, although the State closed eligibility for new entry in 1979, the Retirement System remained, and still remains, in existence for those members who elected to stay within the Plan. The fact that it will, at some future time, be terminated cannot make the distribution to Mr. Conway "on account of" the future termination. Indeed, even for the "last of the Mohicans" who gets the Plan's final distribution, the distribution will not be "on account of" the termination.

Rather, the termination will be "on account of" the distribution which will render the Plan no longer necessary.

### 2. *Section 411*

■ The Taxpayers wish to rely on a definition of "termination" set forth in Treas. Reg. § 1.411(d)–2. According to this regulation, whether a qualified plan has been terminated depends on the facts and circumstances of the case; a reasonable factfinder could determine that a plan terminated, either totally or partially, if: (1) there exists an "exclusion, by reason of a plan amendment ... of a group of employees who have previously been covered by the plan," or (2) a plan amendment "adversely affects the rights of employees to vest in benefits under the plan." *Id.* The Taxpayers argue that by amending the Plan in 1979 to preclude new hires from entering the Retirement System—hires who previously would have been covered by the plan—"a group of employees who have previously been covered by the plan" was excluded. The Taxpayers also argue that by amending the Plan in 1984 to alter the benefit scheme, the State adversely affected the rights of employees to vest in benefits under the Plan.

■ The primary problem with the Taxpayers' arguments is that § 411 relates to vesting requirements for ERISA plan qualification, *and is expressly inapplicable to "government plans."* § 411(e)(1)(A). Consequently, the definition of "termination" provided by Treas.Reg. § 1.411(d)–2 does not apply to a government pension plan.[13]

tion of accumulated deductible employee contributions (within the meaning of § 72(*o* )(5))" under § 402(a)(5)(E)(i)(III).

**13.** Even if § 411 provisions were applicable, the Retirement System would not be considered "terminated." No plan members who *"ha[d] previously been covered"* were "excluded" or forced to exit the Retirement Plan in 1979. New employees (employees who arguably *would* have been covered previously, but who were not actually "members previously covered") were simply precluded from becoming members of the Plan. Furthermore, in 1984, all Retirement System Plan members, including Mr. Conway, were given the option to receive benefits under the Plan's former terms as of that date. Only benefits accruing to Plan participants *after* that date would

be on modified terms. Therefore, the Plan amendment did not "adversely affect the rights of employees to vest in benefits under the plan."

Finally, a plan provider may alter the terms of a plan if the modification is reasonably necessary and does not substantially impair the participant's benefits. *Baker v. Baltimore County, Md.,* 487 F.Supp. 461 (D.Md.1980); *City of Frederick v. Quinn,* 35 Md.App. 626, 371 A.2d 724 (1977). In *Md. State Teachers Ass'n v. Hughes,* 594 F.Supp. 1353 (D.Md.1984), the Court held that: (1) the 1984 alteration of the Retirement System Plan was reasonably necessary in light of its actuarial unsoundness; and (2) the resulting modifications did not substantially impair the participant's benefits.

### 3. The Section 406 Regulations

The Regulations under § 406, rather than § 411, are pertinent to the putative "termination" of a government pension plan. Under Treas.Reg. § 1.401–6(b):

Whether a plan is terminated is generally a question to be determined with regard to all the facts and circumstances in a particular case. For example, a plan is terminated when, in connection with a winding up of the employer's trade or business, the employer begins to discharge his employees. *However, a plan is not terminated ... merely because an employer consolidates or replaces that plan with a comparable plan.*

(emphasis added). A "comparable plan" for a pension trust would include another pension trust. Treas.Reg. § 1.381(c)(11)–1(d)(4).

Here, the Retirement System Plan was not terminated merely because the State attempted to consolidate or replace the Retirement System pension trust with the "comparable" Pension System pension trust. Nor do there exist other facts and circumstances which would create a genuine issue of material fact on the termination issue. The bottom line is that the Plan was not terminated, and the distribution to the Conways was not made "on account of a termination of the plan." § 402(a)(5)(E)(i)(I). Thus, there was no "qualified total distribution."

### D. The Taxpayers Are Liable For The 10% Additional Tax

■ Subject to specified exceptions, when a person receives a distribution from a qualified retirement plan, that person's income tax liability is "increased by an amount equal to ten percent of the portion of such amount which is includible in gross income." § 72(t)(1) (1988). Mr. Conway's distribution did not fall within any of the listed exceptions.[14] Thus, when Mr. Conway received an early distribution from the Retirement System trust, his income tax liability was properly increased by $5,923.03 (ten percent of $59,230.32, the amount received includible in gross income). *See Wheeler v. Commissioner,* 66 T.C.M. 1444, 1446, 1993 WL 488619 The Taxpayers are, consequently, not entitled to a refund of the ten percent addition to tax.

### E. The Taxpayers are Liable For The 6% Excise Tax on Excess Contributions to Individual Retirement Account

■ Section 4973(a) imposes a six percent excise tax on excess contributions to an individual retirement account. As pertinent to this case, contributions greater than $2,000 annually are considered "excess." *See* §§ 219, 4973(b).

As discussed above, the distribution received by Mr. Conway in 1990 was not eligible for tax-free rollover treatment under § 402(a)(5). Consequently, the amount of the distribution transferred to Mr. Conway's IRA in 1990 constitutes a contribution to that IRA. The contribution of $59,230.32 was $57,230.32 in excess of $2,000. This excess is subject to the § 4973(a) six percent excise tax. Thus the Government prevails on its counterclaim seeking recovery of the erroneous refund of this tax plus interest.

---

In sum, the Retirement System Plan would not have been considered "terminated" even under Treas.Reg. § 1.411(d)–2.

14. Pursuant to § 72(t)(2), the ten percent excise tax does not apply to:
(A) Distributions which are—
(i) made on or after the date on which the employee attains age 59½,
(ii) made to a beneficiary (or to the estate of the employee) on or after the death of the employee,
(iii) attributable to the employee's being disabled,
(iv) part of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the employee or the joint lives (or joint life expectancies) of such employee and his beneficiary,
(v) made to an employee after separation from service on account of early retirement under the plan after attainment of age 55, or
(vi) dividends paid with respect to stock of a corporation which are described in section 404(k).
(B) Certain distributions made for medical expenses;
(C) Certain distributions made from stock ownership plans; and
(D) Certain distributions made pursuant to a qualified domestic relations order.

## IV. *CONCLUSION*

For the foregoing reasons:

1. The United States' Motion for Summary Judgment is GRANTED.

2. The United States' [Second] Motion for Summary Judgment is GRANTED.

3. By September 7, 1995:

   a. The Government shall provide an agreed (as to form, but not result) Judgment Order or, absent agreement, provide its proposed Judgment Order.

   b. The Taxpayers shall, absent agreement on the form of Judgment Order, provide their own proposed Judgment Order.

**SO ORDERED.**